In the
United States Court of Appeals
For the Seventh Circuit

No. 13-3638

CARL E. THULIN,

Plaintiff-Appellant,

v.

SHOPKO STORES OPERATING CO., LLC,

Defendant-Appellee.

Appeal from the United States District Court for the
Western District of Wisconsin
No. 3:10-cv-00196 – **William M. Conley,** *Judge*

ARGUED APRIL 25, 2014—DECIDED NOVEMBER 12, 2014

Before KANNE and ROVNER, *Circuit Judges*, and DOW,
*District Judge*.[*]

DOW, *District Judge*.  Relator Carl E. Thulin worked as a
pharmacist at a Shopko retail store in Idaho from 2006 to
2009. During his tenure, Thulin observed what he believed

_____

[*] The Honorable Robert M. Dow, Jr., of the Northern District of Illinois,
sitting by designation.

to be a fraudulent billing scheme in which Shopko submitted inflated claims for prescription drugs to the federal Medicaid program. Thulin filed a *qui tam* complaint against his former employer in its home state of Wisconsin, alleging that Shopko violated the federal False Claims Act by overbilling Medicaid. Thulin also asserted analogous claims under the laws of eight different states in which Shopko does business. Shopko moved to dismiss Thulin's federal claim under Federal Rules of Civil Procedure 9(b) and 12(b)(6). The district court granted the motion and declined to exercise supplemental jurisdiction over Thulin's state law claims. Finding no error, we affirm.

## I.

Because this appeal comes to us from the grant of a motion to dismiss, we accept all facts alleged in Thulin's complaint as true and draw all reasonable inferences in his favor. Shopko is a multi-regional retail pharmacy corporation headquartered in Green Bay, Wisconsin, that operates nearly 300 stores in 24 states. Thulin is a licensed pharmacist who at all relevant times worked as a full-time pharmacist at a Shopko retail store in Idaho.

Some of Shopko's pharmacy customers have prescription coverage through both private insurance and Medicaid, a federal program administered by the states that provides the poor, disabled, and elderly with medical and pharmaceutical insurance coverage. We follow the parties' convention of referring to these individuals as "dual-eligibles." For dual-eligibles, Medicaid acts as a "payer of last resort," which means that it picks up any tab remaining after the dual-

eligible's private insurer has paid the amount that it has contracted to pay Shopko for a particular prescription.

According to Thulin, an excess tab almost always exists. Both Medicaid and private insurers strive to negotiate pharmaceutical discounts and purchasing agreements for their members, but Thulin asserts that private insurers are much better at playing ball than are the government agencies administering Medicaid. The private insurers' negotiating prowess "results in better pricing of prescriptions for the [privately] insured patients." Thulin alleges that this disparity exists in all of the states in which Shopko does business. Thus, when Shopko enters into provider contracts with private insurers, it typically agrees to accept payment in full lesser amounts than it agrees to accept from Medicaid for any given drug. The amount that Shopko agrees to accept is composed of some payment by the insurance company and a co-pay or deductible paid by the patient at the point of sale. The size of the patient's co-pay depends on his or her contract with the private insurance company, to which Shopko is not a party. Privately insured patients, including dual-eligibles, are not parties to the contracts that Shopko signs with their private insurers.

Thulin alleges that when dual-eligibles apply for Medicaid, they are required by 42 U.S.C. § 1396k(a)(1)(A) and 42 C.F.R. § 433.145 to assign to the state any rights they have under their private insurance plans. Thulin alleges that one of these assignable rights is the right to purchase prescription drugs at the lower price that their private insurer negotiated with Shopko. Because dual-eligibles are not parties to the contracts that Shopko signs with their private insurers, however, they do "not know the price they

have legally assigned to the state Medicaid agency." Likewise, Thulin alleges, state Medicaid agencies "do not know the price benefit that the dual-eligible patient assigns to the government." In other words, both Medicaid agencies and dual-eligibles rely on Shopko to accurately calculate and assign the benefits to the government.

According to Thulin, this reliance was misplaced. Shopko programmed its computer system, PDX Adjudication Software System, to systematically exploit the disparity between the pharmaceutical prices negotiated by private insurers and those negotiated by Medicaid. The PDX system (and the apparently identical system, Condor, used by Shopko's subsidiary Pamida) submits claims to a dual-eligible's private insurer first, at the low negotiated rate. PDX subsequently but virtually simultaneously adjusts the initial price upward to the higher one negotiated by Medicaid and bills Medicaid for any unpaid differential, not just the co-pay that the dual-eligible owes under his or her private insurance contract.

An example similar to that provided by Thulin during oral argument helps illustrate the scheme. Assume for instance that a dual-eligible has a prescription for Drug A, which has a list price of $50. Her private insurer has an agreement with Shopko pursuant to which Shopko has agreed to accept $25 as payment in full for Drug A: $20 from the private insurer and a $5 co-pay from the dual-eligible. Under Medicaid's less favorable agreement with Shopko, Medicaid has agreed to pay $30 for Drug A. The dual-eligible submits her prescription to Shopko and pays nothing at the point of sale. Shopko fills the prescription and then bills the private insurer $25 using PDX.  The private

insurer remits payment of $20, the agreed amount of its payment less the dual eligible's unpaid copay. Shopko then bills Medicaid, the "payer of last resort," but not only for the $5 that remains unpaid under its contract with the dual-eligible's private insurer. Instead, Shopko bills Medicaid $10, the difference between the $20 that the private insurer already has paid and the $30 that Medicaid has agreed to pay for the drug.

Thulin alleges that this "internal program of the two systems bills more for dual eligible patients than was allowed under the assignment of rights and benefits provisions of federal law and contract provisions of private insurance companies."  That is, Shopko committed fraud by billing Medicaid an amount in excess of the co-pay that the dual-eligibles owed under their private insurance contracts. Shopko compounded this alleged fraud by omitting from its invoices to Medicaid the amount of dual-eligibles' co-pays. By omitting this information, Thulin alleges, "Shopko failed to report truthfully to Medicaid the nature and extent of [its] obligation."

Thulin discovered the alleged fraud by observing "that there is potential for fraudulent billing involving dual eligible patients" and "that the PDX pharmacy system used by Shopko does not present the billing and payment amount information on the patient bag receipts and it does not make it available to the pharmacist or technician processing prescriptions." Thulin nonetheless managed to obtain and attach to his complaint 31 printouts from the PDX system that allegedly demonstrate the two-pronged fraud. All 31 exhibits concern transactions performed in Idaho.

Yet Thulin filed his suit not in Idaho but in the Western District of Wisconsin, and did not bring any claims under Idaho law. Instead, he filed one claim under the federal False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, and eight analogous state law claims under the laws of California, Illinois, Indiana, Michigan, Minnesota, Montana, Tennessee, and Wisconsin. The attorneys general of the affected states and the federal government declined to intervene in Thulin's *qui tam* suit. Thulin then elected to continue the suit on their behalf, *see* 31 U.S.C. § 3730(c)(3), and Shopko moved to dismiss all of his claims.

The district court granted Shopko's motion to dismiss Thulin's federal claim with prejudice. The district court first concluded that Thulin failed to allege the requisite falsity to state a claim under the False Claims Act because neither 42 U.S.C. § 1396k(a)(1)(A) nor its related regulations were applicable to Shopko and Thulin "fail[ed] to explain how the assignment law applies to Shopko in the first instance or provide any support for his legal claim."

The district court also concluded that Thulin's allegations pertaining to the knowledge element of the claim failed to meet the requirements of Federal Rule of Civil Procedure 8, let alone Rule 9(b). The court concluded that "[t]o the extent plaintiff is alleging that Shopko knows that the assignment law applies to it as a provider (rather than pleading that it knows the prices it negotiates with private health insurers), the pleading is not at all clear." Moreover, "[n]either does plaintiff allege facts to support how Shopko knows of such an obligation, nor who in the organization has actual knowledge." The district court further faulted Thulin for pointing to a Minnesota regulation in his complaint but not

"alleg[ing] any individual transactions in Minnesota as required to meet the pleading requirement of Rule 9(b)."

The district court declined to exercise supplemental jurisdiction over Thulin's state law claims and dismissed them without prejudice. Thulin timely appealed.

## II.

We review *de novo* the district court's grant of a motion to dismiss. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). To survive a motion to dismiss under Rule 12(b)(6), a complaint must provide enough factual information to "state a claim to relief that is plausible on its face" and "raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570, (2007). Whether a complaint states a claim upon which relief may be granted is depends upon the context of the case and "requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal*, 556 U.S. 662, 679, (2009). We accept the complaint's well-pleaded facts as true and construe the allegations in the light most favorable to the plaintiff. *Camasta*, 761 F.3d at 736. However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In a footnote midway through his opening brief, Thulin requests that we confine our review to the allegations in his complaint and ignore the numerous exhibits that Shopko attached to its motion to dismiss. This is of course how both we and the district court generally analyze motions to dismiss. *See* Fed. R. Civ. P. 12(d). However, in this case, the district court considered and relied upon several of the

documents that Shopko attached to its motion, as well as extra-pleading documents submitted by Thulin. The district court concluded that doing so was appropriate because the documents were public records of which it could take judicial notice without converting the motion to dismiss into one for summary judgment. *See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012). Thulin does not challenge this conclusion, nor does he clarify which, if any, of Shopko's documents improperly were considered on this basis. Moreover, he called the issue to our attention only by way of a footnote, *see Long v. Teachers' Ret. Sys. of Ill.*, 585 F.3d 344, 349 (7th Cir. 2009) ("A party may waive an argument by disputing a district court's ruling in a footnote."), and relies upon his own extra-pleading submissions. In light of all these circumstances, we cannot (and do not) conclude that any procedural error by the district court gave rise to anything other than a no-harm, no-foul situation.

Thulin correctly concedes that he must satisfy the heightened pleading standard imposed by Federal Rule of Civil Procedure 9(b). *See United States ex rel. Gross v. AIDS Research Alliance-Chicago*, 415 F.3d 601, 604 (7th Cir. 2005) ("The FCA is an anti-fraud statute and claims under it are subject to the heightened pleading requirements of Rule 9(b)."). We need not overly concern ourselves with the adequacy of Thulin's pleading, however, as we agree with the district court that his legal theory is not viable no matter how detailed his factual allegations.

Thulin brought his claims under the FCA, a statute that permits private citizens, called relators, to prosecute *qui tam* suits "against alleged fraudsters on behalf of the United States government." *United States ex rel. Watson v. King-*

*Vassel*, 728 F.3d 707, 711 (7th Cir. 2013); 31 U.S.C. § 3730. The United States may choose to intervene in these suits. 31 U.S.C. § 3730(b)(2). If the United States declines, as happened in this case, the relator may pursue the case on his own (although still technically on behalf of the United States). *King-Vassel*, 728 F.3d at 711; 31 U.S.C. § 3730(c)(3). "Under either option, if the prosecution of the alleged fraudster is successful, the relator can receive a substantial award for bringing the false claim to light." *King-Vassel*, 728 F.3d at 711; 31 U.S.C. § 3730(d)(1)-(2).

The version of the FCA that was in effect at the time of Shopko's alleged conduct imposed civil liability on "any person who knowingly presents, or causes to be presented, to an officer or employee of the United States Government or a member of the Armed Forces of the United States a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1); *see United States ex rel. Lusby v. Rolls-Royce Corp.*, 570 F.3d 849, 855 n.\* (7th Cir. 2009). The current version of another provision of the FCA – which "applies to cases such as this, that were pending on or after June 7, 2008," *United States ex rel. Yannacopoulos v. Gen. Dynamics*, 652 F.3d 818, 822 n.2 (7th Cir. 2011) – also imposes liability upon "any person who knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(B). Thus, "[t]o establish civil liability under the False Claims Act, a relator generally must prove [at this stage of the case, allege] (1) that the defendant made a statement in order to receive money from the government; (2) that the statement was false; and (3) that the defendant knew the statement was false." *Yannacopoulos*, 652 F.3d at 822. The penalties imposed upon those who are liable under the FCA range from $5,000 to $10,000, "plus 3

times the amount of damages which the Government sustains." 31 U.S.C. § 3729(a)(1)(G); *King-Vassel*, 728 F.3d at 711.

Here, there is no dispute that Thulin adequately pleaded the first element by alleging with particularity that Shopko submitted claims to the federal government via the Medicaid program. *King-Vassel*, 728 F.3d at 711. The next element is that the claims were false. A claim may be false for purposes of the FCA if it is made in contravention of a statute, regulation, or contract. *See United States ex rel. Crews v. NCS Healthcare of Ill., Inc.*, 460 F.3d 853, 858 (7th Cir. 2006). Thulin's theory of falsity is predicated upon 42 U.S.C. § 1396k(a)(1)(A), which he refers to as the "Federal Assignment Law." This provision states:

> For the purpose of assisting in the collection of medical support payments and other payments for medical care owed to recipients of medical assistance under the State plan approved under this subchapter, a State plan for medical assistance shall – provide that, as a condition of eligibility for medical assistance under the State plan to an individual who has the legal capacity to execute an assignment for himself, the individual is required – to assign the State any rights, of the individual or of any other person who is eligible for medical assistance under this subchapter and whose behalf the individual has the legal authority to execute an assignment of such rights, to support (specified as support for the purpose of medical care by a

court or administrative order) and to payment
for medical care from any third party.

Thulin interprets this provision, along with a similarly worded regulation codified at 42 C.F.R. § 433.145(a), to mean that "the government obtains the rights and benefits of the private health insurance for these dual-eligible patients," including their right to the lower prescription drug costs that their private insurers have negotiated with Shopko. Under this view, Medicaid had a right to pay only the lower negotiated cost of the drug that Shopko agreed to accept from the private insurer, and Shopko violated the "Federal Assignment Law" each time it sought payment for any amount in excess of the co-pay (which, according to Thulin, it also had an obligation to notify Medicaid of).

Thulin's strained interpretation has little if any support in the plain language of the provision, which by its terms applies only to a beneficiary's right to actually receive payments. And Thulin has not pointed to – and we could not find – any case law that interprets 42 U.S.C. § 1396k(a)(1)(A) as he does. Instead, the Supreme Court has determined that this "Federal Assignment Law" ensures that Medicaid is entitled to reimbursement of its medical expenditures if a beneficiary receives a settlement or other recovery from third-party tortfeasors. *See Wos v. E.M.A. ex rel. Johnson*, 133 S. Ct. 1391, 1396 (2013) ("Congress has directed States, in administering their Medicaid programs, to seek reimbursement for medical expenses incurred on behalf of beneficiaries who later recover from third-party tortfeasors. States must require beneficiaries 'to assign the State any rights * * * to support (specified as support for the purpose of medical care by a court or administrative order)

and to payment for medical care from any third party.'" 42 U.S.C. § 1396k(a)(1)(A)); *see also Ark. Dep't of Health & Human Servs. v. Ahlborn*, 547 U.S. 268 (2006). Perhaps unsurprisingly, appeals courts that have examined the statute have interpreted it in the same way. *See, e.g., Massachusetts v. Sebelius*, 638 F.3d 24, 33 n.11 (1st Cir. 2011) ("Whereas 42 U.S.C. § 1396a(a)(25)(B) imposes an affirmative obligation on state Medicaid agencies to seek reimbursement, 42 U.S.C. § 1396k(a)(1)(A) confers rights upon state Medicaid agencies to pursue certain claims as a subrogee."). We see no reason to adopt Thulin's novel interpretation, and we cannot conclude that the district court erred in also declining to do so.

We further note that the extra-pleading evidence submitted by the parties—considered by the district court, and briefed and argued here—also suggests that Shopko was not obligated to inform Medicaid of dual-eligibles' co-pays and was permitted to bill in the fashion that it did. The parties discuss at length the electronic system that pharmacies were required to use to submit claims to Medicaid agencies during the relevant time period, version 5.1 of the National Council for Prescription Drug Programs ("NCPDP 5.1"). *See* 42 U.S.C. § 1320d-2(a)(1); 45 C.F.R. §§ 162.1102(a)(1), 162.1801-162.1802. NCPDP 5.1 and its "Implementation Guide" provided standard specifications for various data inputs relating to Medicaid claims. As is relevant here, the pertinent fields related to co-pays were labeled optional; other data fields were labeled mandatory or "RW," which means that they were required under certain circumstances. Like the district court, we find this compelling evidence that pharmacies like Shopko did not have an obligation to submit co-pay information to Medicaid. If they did, one would think that such an

obligation would have been incorporated into the billing protocol that they were legally required to use.

Thulin's proffered excerpt from the "Q&A" portion of the NCPDP only lends further credence to this conclusion, as it demonstrates that providers were "looking for clarification" on this important billing issue rather than simply concluding that they needed to inform Medicaid of dual-eligibles' co-pays. Additionally, the State Medicaid Manual promulgated by the Centers for Medicare & Medicaid Services directs state Medicaid agencies to withhold payment "[w]henever you are billed for the difference between the payment received from the third party based on [a preferred provider agreement that it has with the pharmacy]." Centers for Medicare & Medicaid Services, STATE MEDICAID MANUAL § 3904.7 (1990). Thulin is correct that this provision supports his contention that Medicaid is only liable to the extent that a dual-eligible's private insurer has not paid, but he overlooks the language quoted above, which expressly contemplates that Medicaid will get billed for amounts beyond what it technically owes and bears responsibility for not paying when that happens. Shopko's alleged actions may "frustrate and derail the 'cost avoidance' mandate," and result in additional bureaucratic hassle on both Medicaid's and Shopko's end, but they are not false or fraudulent under the State Medicaid Manual or any other regulation or law to which Thulin points.

Because Thulin's FCA claim lacks a legal basis as pleaded, it is inherently implausible and properly was dismissed. For the sake of completeness, we briefly address Thulin's argument concerning the adequacy of his allegations that Shopko "knew" it was submitting false

claims. To be liable under the FCA, Shopko must have acted with "actual knowledge," or with "deliberate ignorance" or "reckless disregard" to the possibility that the claims it submitted were false. *King-Vassel*, 728 F.3d at 712; 31 U.S.C. § 3729(a)(1)(A), (b). Thulin contends that his complaint plausibly suggested that Shopko acted with "reckless disregard" as we defined the term in *King-Vassel*, 728 F.3d at 712-13, because he alleged that Shopko is a "sophisticated," "multi-regional" business that developed and programmed the PDX system and should have been aware of federal statutes and regulations governing the submission of claims to Medicaid. In reaching a contrary conclusion, Thulin contends, the district court must have ignored *King-Vassel*'s explication of "reckless disregard." We disagree. Thulin's allegations would not be sufficient to satisfy his pleading requirement even if Shopko's billing practices were contrary to the "Federal Assignment Law." Although "[m]alice, intent, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), vague allegations that a corporation acted with reckless disregard—*i.e.*, grossly negligently or with reason to know of facts that would lead a reasonable person to realize that it was submitting false claims, *see King-Vassel*, 728 F.3d at 713—simply by virtue of its size, sophistication, or reach do not clear even this lower pleading threshold. Such allegations may suggest a possibility that Shopko acted with reckless disregard, but they do not "nudg[e]" Thulin's claims "across the line from conceivable to plausible." *Iqbal*, 556 U.S. at 680.

## III.

For all of the reasons stated above, the judgment of the district court is AFFRIMED.