In the

# United States Court of Appeals

## For the Seventh Circuit

_____

No. 17-3633

HOLLY B. VANZANT and
DANA LAND, on behalf of themselves
and all others similarly situated,

*Plaintiffs-Appellants*,

*v.*

HILL'S PET NUTRITION, INC., and
PETSMART, INC.,

*Defendants-Appellees*.

_____

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 17-cv-2535 — **Samuel Der-Yeghiayan**, *Judge*.

_____

ARGUED SEPTEMBER 27, 2018 — DECIDED AUGUST 20, 2019

_____

Before FLAUM, MANION, and SYKES, *Circuit Judges*.

SYKES, *Circuit Judge*. Holly Vanzant and Dana Land own
cats with health problems. Their veterinarians prescribed cat
food manufactured by Hill's Pet Nutrition, Inc., and sold
under Hill's "Prescription Diet" brand. For several years
Vanzant and Land purchased this higher-priced cat food

from their local PetSmart stores using their veterinarian's prescriptions. They eventually learned, however, that the Prescription Diet cat food is not materially different from nonprescription cat food. And the prescription requirement is illusory; no prescription is necessary. Feeling deceived, Vanzant and Land filed a class-action lawsuit against Hill's and PetSmart, Inc., asserting claims under the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILL. COMP. STAT. 505/1 *et seq.*, and for unjust enrichment.

The district judge dismissed the Consumer Fraud Act claim for two reasons: (1) the complaint lacked the specificity required for a fraud claim; and (2) the claim is barred by a statutory safe harbor for conduct specifically authorized by a regulatory body—here, the U.S. Food and Drug Administration ("FDA"). The judge dismissed the unjust-enrichment claim because it was premised on the same conduct as the statutory claim.

We reverse. First, the safe-harbor provision does not apply. Under the Food, Drug, and Cosmetic Act, 21 U.S.C. §§ 301 *et seq.*, pet food intended to treat or prevent disease and marketed as such is considered a drug and requires approval of a new animal drug application. Without FDA approval, the manufacturer may not sell it in interstate commerce and the product is deemed adulterated and misbranded. The FDA issued guidance recognizing that most pet-food products in this category do not have the required approval; the guidance states that the agency is less likely to initiate an enforcement action if consumers purchase the food through or under the direction of a veterinarian (among other factors guiding the agency's enforcement discretion). But the guidance does not

specifically *authorize* the conduct alleged here, so the safe harbor does not apply.

And the plaintiffs pleaded the fraud claim with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure. So the statutory claim may proceed. The unjust-enrichment claim is more appropriately construed as a request for relief in the form of restitution based on the alleged fraud. In Illinois unjust enrichment is not a separate cause of action but is a condition brought about by fraud or other unlawful conduct. *Toulon v. Cont'l Cas. Co.*, 877 F.3d 725, 741 (7th Cir. 2017). The request for restitution based on unjust enrichment therefore rests entirely on the consumer-fraud claim, and it too may move forward.

## I. Background

The case comes to us from a dismissal at the pleadings stage, so we recount the facts as alleged in the amended complaint. Hill's Pet Nutrition manufactures a variety of pet food, and this case concerns its Prescription Diet brand. Hill's sells its Prescription Diet pet food through veterinarians and pet-food retailers, though consumers may purchase it from a retailer only with a veterinarian's prescription. PetSmart sells pet supplies and pet food, including Hill's Prescription Diet brand. Consumers need a veterinarian's prescription to purchase Hill's Prescription Diet food at PetSmart.

In January 2013 Holly Vanzant's cat Tarik underwent emergency surgery for bladder stones. At a follow-up appointment, Tarik's veterinarian prescribed Hill's Prescription Diet c/d Multicare Feline Bladder Health cat food. That same day Vanzant purchased the food at a

PetSmart store. Inside she saw marketing materials indicating that the cat food is "prescription only," and the label on the bag read "Hill's Prescription Diet." PetSmart provided her with a pet prescription card listing Tarik's name, prescription number, and prescription date. For three years Vanzant purchased Hill's Prescription Diet cat food from PetSmart, paying a higher price than for nonprescription food. She showed the prescription card to the cashier each time.

Land had a similar experience. In October 2013 a veterinarian diagnosed her cat Chief with diabetes and prescribed Hill's Prescription Diet m/d Feline Glucose/Weight Management cat food. Within a few weeks, Land purchased Hill's Prescription Diet cat food at a PetSmart store. She too saw marketing materials inside the store indicating that the food is meant to treat or control diabetes. PetSmart provided Land with a pet prescription card listing Chief's name, prescription number, and prescription date. For two years Land purchased Hill's Prescription Diet cat food from PetSmart, paying a higher price than for nonprescription food. She too showed the prescription card each time.

Vanzant and Land eventually learned they were not receiving what they expected. They thought prescription pet food was medically necessary for the health of their pets, had been approved by the FDA, and could not be sold legally without a prescription. But the FDA had not approved it, and nothing required that it be sold with a prescription. They filed a proposed class action in state court against Hill's and PetSmart alleging claims for violation of the Illinois Consumer Fraud Act and unjust enrichment. The

defendants removed the case to federal court and moved to dismiss it under Rule 12(b)(6).

The judge granted the motion. He held that the Consumer Fraud Act claim is foreclosed by the statute's safe-harbor provision, which shields actions authorized by laws administered by a regulatory body. Specifically, the judge relied on an FDA Compliance Policy Guide, which he construed as regulatory authorization for "the gate-keeping role of veterinarians in ensuring that pet owners purchase only appropriate therapeutic foods." The judge also concluded that Vanzant and Land failed to plead the consumer-fraud claim with the particularity required by Rule 9(b). With no underlying fraud claim remaining, the judge likewise dismissed the unjust-enrichment claim. Vanzant and Land appealed.

## II. Discussion

We review the dismissal order de novo. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). To survive a motion to dismiss, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). At a minimum it "must give enough details about the subject matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010).

The Illinois Consumer Fraud Act "protect[s] consumers … against fraud, unfair methods of competition, and other unfair and deceptive business practices." *Robinson v. Toyota Motor Credit Corp.*, 775 N.E.2d 951, 960 (Ill. 2002). Deceptive or unfair practices include any "misrepresentation

or the concealment, suppression or omission of any material fact." 815 ILL. COMP. STAT. 505/2. To recover on a claim under the Act, a plaintiff must plead and prove that the defendant committed a deceptive or unfair act with the intent that others rely on the deception, that the act occurred in the course of trade or commerce, and that it caused actual damages. *Siegel v. Shell Oil Co.*, 612 F.3d 932, 934–35 (7th Cir. 2010). We begin, however, with the Act's safe-harbor provision.

## A. Safe-Harbor Provision

The Illinois Consumer Fraud Act exempts some acts and practices from liability under a safe-harbor provision. *See* 815 ILL. COMP. STAT. 505/10b(1). One component of that safe harbor covers actions "specifically authorized by laws administered by any regulatory body or officer acting under statutory authority of this State or the United States." *Id.* This provision allows regulated actors to "rely on the directions received from [regulatory] agencies without risk that such reliance might expose them to … liability." *Price v. Philip Morris, Inc.*, 848 N.E.2d 1, 38 (Ill. 2005).

To trigger the safe harbor, the regulatory body must be operating within its statutory authority and the challenged conduct must be "specifically authorized by laws administered by" that regulatory body. § 10b(1). Formal rulemaking is not necessary; "informal regulatory activity" is enough. *Price*, 848 N.E.2d at 46. The FDA's statutory authority includes regulation of pet food, so the dispute centers on whether the agency's guidance qualifies as informal regulatory activity and specifically authorizes the relevant conduct.

The Food, Drug, and Cosmetic Act ("FDCA"), 21 U.S.C. §§ 301 *et seq.*, regulates pet food. Because Hill's Prescription Diet cat food is intended to treat or prevent disease and is marketed as such, the products are considered "drugs" under the FDCA. *Id.* § 321(g)(1)(B). Without FDA approval, a new animal drug cannot be sold in interstate commerce, *id.* § 331(a), and the product is deemed misbranded and adulterated, *id.* §§ 352(o), 351(a)(5).

Manufacturers face two additional requirements, regardless of whether the animal drug at issue has been approved. All drug manufacturers must list their drugs and register their facilities or else the drugs are misbranded. *Id.* § 352(o). And animal drug products must be manufactured in compliance with current good-manufacturing practices applicable to drugs, otherwise the drugs are adulterated. *Id.* § 351(a)(2)(B).

Most pet-food products claiming to treat or prevent disease lack FDA approval and do not comply with the FDCA's drug registration and listing requirements. Nor do the manufacturers of these products follow the appropriate manufacturing practices for animal drugs. The FDA issued guidance acknowledging this longstanding noncompliance and identifying circumstances in which the agency may exercise its discretion against initiating an enforcement action.

The 2016 FDA Compliance Policy Guide offers the FDA's current thinking on the likelihood of an enforcement action. The guide lists factors for agency staff to consider— including, for example, whether the product presents a known safety risk when used as labeled, whether the product label represents that it can be used to treat disease, and

whether the product is marketed as an alternative to approved new drugs. U.S. Dep't of Health & Human Servs. Food & Drug Admin., Compliance Policy Guide Sec. 690.150 Labeling & Marketing of Dog & Cat Food Diets Intended to Diagnose, Cure, Mitigate, Treat, or Prevent Diseases: Guidance for FDA Staff 6 (Apr. 2016), https://www.fda.gov/media/83998/download. The guide goes on to list 11 factors that make an enforcement action "less likely"—but only if all 11 are present. *Id.* at 7.

Hill's and PetSmart characterize the Compliance Policy Guide as informal regulatory activity specifically authorizing the prescription requirement and prescription label for Hill's Prescription Diet pet food. They are mistaken. The FDA classifies the guide as a "Level 1 guidance document[]" that "[s]et[s] forth initial interpretations of statutory or regulatory requirements" and details "changes in interpretation or policy that are of more than a minor nature." 21 C.F.R. § 10.115(c)(1)(i)-(ii); Draft Compliance Policy Guide Sec. 690.150 on Labeling and Marketing of Nutritional Products Intended for Use in Dogs and Cats, 77 Fed. Reg. 55,480, 55,480 (Sept. 10, 2012). But the guide does not establish any legally enforceable responsibilities, and it is not binding on either the FDA or the public.

Contrast the Compliance Policy Guide with the regulatory action in *Price v. Philip Morris*, where the Illinois Supreme Court held that a consent order between the Federal Trade Commission ("FTC") and a cigarette manufacturer triggered the Consumer Fraud Act's safe harbor because the consent order could be understood as "provid[ing] guidance" about cigarette labeling to the entire industry. 848 N.E.2d at 46. Even though the consent order

did not bind other industry actors, the safe harbor applied because the order "announce[d] to an entire industry what behavior is and is not authorized." *Id.* at 43. Hill's and PetSmart cite *Price* for support, but the case cuts against them. The FDA Compliance Policy Guide does not establish industry-wide standards for labeling and marketing of pet food intended to treat or prevent disease. Rather, the document helps FDA staff allocate enforcement resources. It does not qualify as informal regulatory activity.

Nor does the guide specifically authorize the prescription requirement and label. To determine whether conduct has been specifically authorized by a regulatory body, Illinois courts look to the "affirmative acts or expressions of authorization" by the relevant agency. *Id.* at 36. For an authorization to be "specific," it must be "related to a *particular thing*," but "it need not *be express*." *Id.* at 42 (emphases added). In *Price*, for example, the defendant cigarette company's use of the term "lights" in its marketing was held to be specifically authorized by FTC consent orders with other manufacturers—even though those orders authorized the use of the terms "low," "lower," "reduced," or "like qualifying terms" to describe tar and nicotine content but did not expressly include the term "lights." *Id.* at 43.

In contrast, of the 11 factors listed in the Compliance Policy Guide as making an enforcement action less likely, only one is relevant here: whether "[t]he product is made available to the public only through licensed veterinarians or through retail or internet sales to individuals purchasing the product under the direction of a veterinarian." U.S. FDA COMPLIANCE POLICY GUIDE 7. The defendants rely on this factor as evidence that the FDA specifically authorizes the

prescription requirement. But this argument wrongly equates regulatory forbearance with regulatory authorization.

To be sure, if pet food intended to treat or prevent disease is purchased from or under the direction of a licensed veterinarian, the FDA is less likely to initiate an enforcement action based on the lack of an approved new animal drug application—*provided*, however, that the other 10 factors are also present. And "less likely" does not mean "will not"; it certainly doesn't signal authorization. Because the Compliance Policy Guide doesn't specifically authorize the Hill's prescription requirement, prescription label, and related marketing representations, the safe harbor does not apply.

## B.  Consumer Fraud Act Allegations

With the safe harbor off the table, our next question is whether the complaint adequately alleges that Hill's and PetSmart committed a deceptive or unfair practice. These are separate categories; deceptive conduct is distinct from unfair conduct. A claim under the Consumer Fraud Act may be premised on either (or both), but the two categories have different pleading standards. If the claim rests on allegations of deceptive conduct, then Rule 9(b) applies and the plaintiff must plead with particularity the circumstances constituting fraud. *Camasta*, 761 F.3d at 737. Specifically, the complaint must identify the "who, what, when, where, and how" of the alleged fraud. *Id.* (quotation marks omitted).

On the other hand, "[a] plaintiff may allege that conduct is unfair … without alleging that the conduct is deceptive." *Siegel*, 612 F.3d at 935. To determine whether a practice is unfair, Illinois courts consider three factors: whether it

"offends public policy"; is "immoral, unethical, oppressive, or unscrupulous"; or "causes substantial injury to consumers." *Batson v. Live Nation Entm't, Inc.*, 746 F.3d 827, 830 (7th Cir. 2014). A plaintiff need not satisfy all three factors; "[a] practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Robinson*, 775 N.E.2d at 961 (quotation marks omitted). And because fraud is not a required element, Rule 9(b)'s heightened pleading standard does not apply. *See Windy City Metal Fabricators & Supply, Inc. v. CIT Tech. Fin. Servs., Inc.*, 536 F.3d 663, 670 (7th Cir. 2008). Finally, under either theory of the case, the plaintiff must adequately plead causation—more specifically, he must allege that but for the defendant's deceptive or unfair conduct, he "would not have been damaged." *Siegel*, 612 F.3d at 935 (quotation marks omitted).

The complaint alleges that the defendants' marketing practices are both deceptive *and* unfair. Taking the first category first, the complaint alleges that the prescription requirement, prescription label, and related marketing materials for Hill's Prescription Diet pet food are deceptive because no prescription is necessary and there is no material difference between the "prescription" food and nonprescription food. Hill's and PetSmart respond that the complaint is deficient because it does not allege that Vanzant and Land relied on the deceptive representations when purchasing Hill's Prescription Diet food. This argument misconstrues Illinois law. "[R]eliance is not an element of statutory consumer fraud." *Connick v. Suzuki Motor Co.*, 675 N.E.2d 584, 593 (Ill. 1996). Rather, it's the plaintiff's "damage," not his purchase, that must occur "as a result of" the deceptive act or practice. *Oliveira*, 776 N.E.2d at 160. Indeed, it was enough

in *Connick* that the plaintiffs' purchases "occurred after the allegedly fraudulent statements." 675 N.E.2d at 595.

Here, the complaint alleges that the prescription requirement, prescription label, and associated marketing materials for Hill's Prescription Diet were deceptive; that Vanzant and Land saw the specific "prescription" language and symbols when they made their purchases; that the prescription pet food was something less than they expected; and that they suffered damages because they paid a higher price. These allegations detail the "who," "what," and "how" of the fraud claim with particularity. *Camasta*, 761 F.3d at 737.

The complaint also alleges the "when" and "where" of the fraud. Vanzant saw marketing materials for Prescription Diet pet food before purchasing the cat food at PetSmart in February 2013 and thereafter. Land saw similar marketing materials before purchasing Prescription Diet cat food from PetSmart in November 2013 and thereafter. Nothing more is needed.

In short, the complaint pleads a deceptive-practices claim to the degree of particularity required by Rule 9(b). That's enough to reverse the dismissal of the Consumer Fraud Act claim, so it's not necessary to address the adequacy of the allegations under the unfair-practices theory of the case. As we've noted, an unfair-practices claim has no fraud element and therefore is not subject to a heightened pleading standard.

## C. Unjust Enrichment

The complaint also seeks restitution for unjust enrichment. "Under Illinois law, unjust enrichment is not a

separate cause of action." *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Tr. v. Walgreen Co.*, 631 F.3d 436, 447 (7th Cir. 2011). Rather, it's a condition brought about by fraud or other unlawful conduct. *Toulon*, 877 F.3d at 741. Accordingly, the request for relief based on unjust enrichment is tied to the fate of the claim under the Consumer Fraud Act. *Cleary v. Philip Morris Inc.*, 656 F.3d 511, 518 (7th Cir. 2011). The statutory claim may move forward, and that revives the request for restitution based on unjust enrichment.

REVERSED